UNITED STATES of America, Appellee,

v.

Jimmie L. WILSON, Appellant.

No. 87–2280.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 8, 1988.

Decided Sept. 13, 1989.

Darrell F. Brown, Little Rock, Ark., for appellant.

Michael Johnson, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before LAY, Chief Judge, HEANEY and BRIGHT, Senior Circuit Judges, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, and BEAM, Circuit Judges, En Banc.

BRIGHT, Senior Circuit Judge.

Jimmie L. Wilson, a black male, in appealing from a judgment of his criminal conviction attacks the district court's determination that the Government did not violate the dictates of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court held that the Government had rebutted Wilson's prima facie case of race discrimination in the selection of the jury panel in his criminal prosecution. After en banc consideration,[1] we hold that the Government failed to rebut Wilson's prima facie case of purposeful race discrimination because it did not offer a racially neutral explanation for striking Charlie Brooks, a black venireman. Accordingly, we reverse and remand for a new trial.

---

1. The panel opinion of the court previously filed, *United States v. Jimmie L. Wilson*, 853 F.2d 606 (8th Cir.1988), was automatically vacated on the granting of the petition for rehearing en banc. *United States v. Jimmie L. Wilson*, 861 F.2d 514 (8th Cir.1988).

## I. BACKGROUND

In 1984, a grand jury indicted Wilson for defrauding the United States government by knowingly disposing of property mortgaged to a government agency, in violation of 18 U.S.C. §§ 371, 641, and 658. In 1985, a jury in the United States District Court for the Eastern District of Arkansas found Wilson guilty. Wilson appealed, alleging, among other issues, that the Government's use of its six peremptory challenges to strike six blacks from the jury panel violated his constitutional rights. This court affirmed the conviction in all respects. *See United States v. Jimmie L. Wilson,* 806 F.2d 171 (8th Cir.1986). In that opinion the court noted that, at the time of decision, the Supreme Court's recent decision in *Batson v. Kentucky* did not apply to Wilson's case, and that he failed to establish a case of discrimination under *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 *reh'g denied,* 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965), the prevailing law at the time.

After the decision, the Supreme Court decided *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which held that *Batson* applied to cases which had not become final on direct appeal before the issuance of *Batson.* Because Wilson's appeal fell within this category, this court vacated its prior decision and remanded the case to the district court for a *Batson* hearing. *United States v. Jimmie L. Wilson,* 815 F.2d 52 (8th Cir.1987).

## II. BATSON HEARING

On July 13 and 30, 1987, the district court held a *Batson* hearing. The court found that Wilson had established a strong prima facie case of racial discrimination because the Government had used all six of its peremptory challenges to exclude six blacks from the jury panel. The court then offered the Government the opportunity to offer a "neutral explanation ... not based upon race" to account for the strikes. (Tr. 5).

"[U]nder *Batson,* the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." *United States v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987). We, therefore, only address the Government's explanation for striking Charlie Brooks. We need not and do not address the Government's explanation for striking the other five black veniremen. Nor do we reach Wilson's other allegations of error during the *Batson* hearing.

The Government introduced testimony that Wilson was a well-known civil rights activist in the Lexa area and that great racial strife existed in the area. Wilson worked as a farmer and lawyer in the Lexa/Helena area of eastern Arkansas.

The Government struck Brooks, a black man who lived in Lexa, but did not strike Agnes Ginn, a white woman, who also lived in Lexa. During voir dire, both Brooks and Ginn denied knowing Wilson. The Government testified it struck Brooks because it had been aware of allegations of possible jury tampering by Wilson's friends and feared Wilson's friends would contact Brooks. In testimony at the *Batson* hearing on remand, one of the prosecutors explained the strike as follows:

A: [prosecutor] The next one was Charlie Brooks. This was a strike that I remember [the other prosecutor] and I discussing. The address that he gave was Lexa. Lexa is a rather broad area down in Phillips County, but it also encompasses—that route also encompasses where Mr. Wilson and Mr. Weaver lives. There was also, I think, another person from Lexa or that area. They did not indicate that they knew Mr. Wilson. It was kind of hard—Mr. Brooks was black. It is kind of hard for me to believe that he lives in an area as active as Mr. Wilson has been in community affairs and activisms and so forth that he would not know Mr. Wilson.

My concern about him was the possibility that some of Mr. Wilson's friends would contact Mr. Brooks down there in that community. We have seen that happen before in certain cases and that was

the concern I had and I was definitely for striking Mr. Brooks.

I do not think that the other person who lived in the area would have been subject to any extramural contacts by any of Mr. Wilson's friends.

(Tr. 177–78).

\*     \*     \*     \*

Q. [defense counsel] Weren't there whites from Lexa?

A. [prosecutor] Mr. Wilson's friends aren't—given the situation down in Phillips County—aren't going to be contacting whites on behalf of Mr. Wilson.

Q. How do you know he doesn't have any white friends?

A. I don't know that he doesn't, but my assumption would be that they would have contacted Mr. Brooks.

Q. So you did not expect Wilson's friends to contact whites?

A. I mean, that's something you can't rule out, but you wouldn't be expecting, given—I mean, Phillips County is not—you know, it's probably a special case, but—

Q. How special is that case?

A. There appears historically to be problems down there between the races.

(Tr. 193–94).

\*     \*     \*     \*

Q. Will you admit that because of the large number of blacks in the Lexa area and because of Wilson's reputation it was necessary for you to more closely scrutinize the black panel members than the white panel members; yes or no?

A. With regard to Lexa area, it was the connection with Mr. Wilson which was the problem; not so much race.

Q. Well, did you not—

A. I mean, race is just a—race sets it up like being member of a lodge.

(Tr. 209–10)

\*     \*     \*     \*

Q. The distinguishing factor between Mr. Brooks and Ms. Ginn would be their race; isn't that correct?

A. The distinguishing relationship—you mean the difference between Ms. Ginn and Mr. Brooks was that there are more likely to be extramural contacts with Mr. Brooks. Which you can say given the situation down there, would be because he's black opposed to—

Q. Why?

A. It's a close-knit community down there.

(Tr. 212–13).

At the conclusion of the hearing, the district court found that the prosecutors "exercised the peremptory challenges ... for the very reasons they testified to in the hearing," and "credit[ed] their testimony in that regard." (Tr. 281). The court further found that "race was not in any way a factor" in the exercise of the peremptory challenges. (Tr. 281).

## III. DISCUSSION

■ In *Batson*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the [government's] case against a black defendant." 476 U.S. at 89, 106 S.Ct. at 1719. Under *Batson* in order to establish an equal protection violation, "a defendant must first establish a prima facie case of purposeful discrimination in selection of the jury panel." *United States v. Battle*, 836 F.2d at 1085. "In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1723. Here, the Government concedes that appellant Wilson established a prima facie case of discrimination. In that regard, it is important to observe that a prima facie case may be made where relevant circumstances indicate an inference of purposeful race discrimination no matter that one or more black persons may remain on the jury. *See United States v. Battle*, 836 F.2d at 1086.

After a defendant establishes a prima facie case, the burden then shifts to the government to "articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98, 106 S.Ct. at

1724. "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)).

■ In *Batson,* the Court emphasized that "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged the jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." 476 U.S. at 97, 106 S.Ct. at 1723. "Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.' " *Id.* at 98, 106 S.Ct. at 1724 (quoting *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)). The defendant must then be given the opportunity to demonstrate that the proffered reasons are pretextual. *United States v. George Wilson,* 816 F.2d 421, 423 (8th Cir.1987). *See also, e.g., United States v. Roan Eagle,* 867 F.2d 436, 440–42 (8th Cir.1989) (permissible to strike juror on account of prior jury service that acquitted, close family relationship to a convicted criminal, and, in some circumstances, subjective evaluation).

In reviewing the district court's findings, we are aware that " 'a finding of intentional discrimination is a finding of fact' " subject to the clearly erroneous rule, *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21 (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), and that "[s]ince the trial judge's findings * * * largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City,* 470

U.S. at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

■ In this case, the district court's credibility finding that the Government struck Brooks for the proffered reason is not at issue. The record clearly shows that the Government struck Brooks because of its belief that Wilson's friends were more likely to contact Brooks, a black, than Ginn, a white. In this case, we are only concerned with whether the Government met its burden of articulating a racially neutral explanation for striking Brooks.

A review of the transcript, as illustrated by the above excerpts, convinces us that the Government did not present a neutral explanation for striking the black person in question. The Government's motivation rests on a prosecutor's assumption that race is "like being a member of a lodge." Under *Batson,* such a reason does not qualify as a racially neutral explanation. As stated in *Batson,* "[t]he core guarantee of equal protection, ensuring citizens that their [government] will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." 476 U.S. at 97–98, 106 S.Ct. at 1723.

Where as here the testimony of the prosecutor indicates a stereotypical racial reason for striking the potential black juror Brooks, the district court's finding that "race was not in any way a factor" in the Government's exercise of its challenge receives no support from the record. The prima facie case of discrimination has not been overcome. Thus, the district court's finding to the contrary is clearly erroneous in this case. *Compare United States v. George Wilson,* 867 F.2d 486, 488 (8th Cir. 1989) (Government "undoubtedly" articulated racially neutral explanations for striking black veniremen).

Where "the trial court decides that the facts establish, prima facie, purposeful discrimination," as in this case, "and the prosecutor does not come forward with a neutral explanation for his action," we must

reverse the defendant's conviction. *Batson*, 476 U.S. at 100, 106 S.Ct. at 1725.

Reversed and remanded for a new trial.

BOWMAN, Circuit Judge, dissenting, joined by JOHN R. GIBSON, FAGG, and WOLLMAN, Circuit Judges.

The opinion of the Court holds clearly erroneous the district court's finding that the prosecutor provided a racially neutral, nonpretextual explanation for striking Brooks, a black venireman. I respectfully dissent.

Fairly stated, and as accepted by the district court, the prosecutor's explanation for striking Brooks is that Brooks's statement that he did not know either defendant Wilson or his initial co-defendant Willie Weaver lacked credibility, since Brooks, Wilson, and Weaver all had substantial connections with Lexa, a small rural community outside of Helena, Arkansas; Brooks was approximately 59 years old and had lived in Lexa for many years; and defendant Wilson was a well-known activist in this small community. In addition, the prosecution was informed by the Department of Agriculture agent assigned to the case as an investigator that Wilson had made several statements to the effect that he had friends on the jury panel or that friends had contacted members of the panel. The prosecution's concern about improper contacts was heightened by experience in other cases. As one of the prosecutors testified, "My concern about [Brooks] was the possibility that some of Mr. Wilson's friends would contact Mr. Brooks down there in that community. We have seen that happen before in certain cases and that was the concern I had and I was definitely for striking Mr. Brooks." (Tr. 177–78).

Finally, but importantly, the prosecution was aware of racial strife in the Lexa area, and therefore believed that Agnes Ginn, a white venirewoman who also lived in Lexa, would not likely be contacted by Wilson's friends. The prosecution viewed Lexa as a "close-knit community" (Tr. 213) with a long history of "problems down there between the races." (Tr. 194). Thus the prosecution did not suspect that the defense would tamper with a white juror from Lexa. ("Mr. Wilson's friends aren't—given the situation down in Phillips County—aren't going to be contacting whites on behalf of Mr. Wilson.") (Tr. 193). It was against this background that one of the prosecutors testified, in response to a leading question by defense counsel concerning the Lexa area and closer scrutiny of black than white panel members, "I mean, race is just a—race sets it up like being a member of a lodge." (Tr. 210).

The opinion of the Court yanks the immediately preceding statement out of context, and having done so, proceeds to treat it as though it represented the totality of the prosecution's explanation for its striking Brooks but not Ginn. *Ante* at 1124. Ignoring the fact of racial polarization in the Lexa community, the opinion of the Court condemns the prosecutor's explanation as "a stereotypical racial reason," and therefore concludes that the prima facie case of discrimination has not been overcome and that the district court's finding to the contrary is clearly erroneous. *Ante* at 1124. Our Court's highly selective reading of the record and the Court's resulting conclusions are not faithful either to *Batson* or to the established limits on the scope of our review of findings of fact made by a district court.

The constitutional limitation on the use of peremptory challenges bars "purposeful discrimination" against blacks and other cognizable racial groups. *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1986). It "forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black." *Id.* at 97, 106 S.Ct. at 1723. Once the defendant makes a prima facie showing, as Wilson has done here,

> The prosecutor ... must articulate a neutral explanation related to the particular case to be tried. The *trial court* then will have the duty to determine if the defendant has established purposeful discrimination.

*Id.* at 98, 106 S.Ct. at 1724 (emphasis added and footnote omitted). In a footnote at the end of the just-quoted passage, the *Batson* opinion cites *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (trial court's finding on issue of intentional discrimination is a finding of fact), and adds that "[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.

In the present case, the district court, having heard the prosecution's full explanation of its use of peremptory strikes against black veniremen, and having been satisfied as to the truthfulness and the neutral character of that explanation, found that Wilson had not established purposeful discrimination. The district court found as follows:

[T]he focus here is a narrow one: Has the prosecutor provided this Court with a neutral explanation for its exercise of its strikes? It is clear to the Court and the Court so finds that the Government has provided such a neutral explanation. The Court has tried to give the defendant wide latitude in attacking the credibility of those explanations in its efforts to show that they were not the true reasons for the strikes but, in fact, were pretextual and that the true reasons were based upon racial considerations.

After hearing all the evidence, the Court is convinced and so finds that Mrs. Cherry and Mr. Jackson exercised the peremptory challenges given to them by law for the very reasons that they testified to in this hearing. It credits their testimony in that regard.

The Court is convinced that those explanations are not pretextual. It is further convinced and so finds that race was not in any way a factor in the exercise—in the decision to exercise those peremptory challenges.

The Court credits the testimony of Mr. Jackson that he and Mrs. Cherry were aware of certain controversies that had occurred in Phillips County that had a tendency to result in racial polarization. They mentioned boycotts and other things in which the defendant, Mr. Wilson, had played some role, some active role. They obtained the list and attempted to research the list. They were made aware of, whether true or not, certain statements that the defendant in substance had indicated that he had friends on the panel or that there were persons on the panel that could be contacted by his friends. This was background to the research that they did. They did contact, as they testified, the police officers, prosecutors, others, and gave them the jury list and asked them to give them their opinion as to the jurors.

As I indicated, they did not investigate just the blacks on the panel. They investigated the entire panel in this regard.

I have made my findings, I believe, and I do not have any doubt that Mrs. Cherry and Mr. Jackson exercised their challenges for the reasons that they stated.

(Tr. 280–82).

The district court's analysis of Wilson's claim of purposeful discrimination is entirely consistent with *Batson.* *Batson* requires that the prosecutor's explanation must be "clear and reasonably specific," it must contain "legitimate reasons" for exercising the challenges, and it must be "related to the particular case to be tried." 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20. Here, the prosecution was legitimately concerned about jury tampering, and clearly articulated its reasons for disbelieving Brooks's statement that he did not know the defendants in this case. The court's finding that the prosecution had not been shown to have engaged in purposeful discrimination clearly reflects the court's acceptance of the factual proposition that the peremptory challenge of Brooks was not based on a "stereotypical racial reason," as asserted in the opinion of our Court, but on legitimate concerns for the integrity of the trial jury—concerns grounded on the threat of possible jury tampering, the fact of racial polarization in Lexa, Wilson's notoriety in Lexa, and the realities of life in that small community.

In holding clearly erroneous the district court's finding that Wilson failed to establish purposeful discrimination, our Court oversteps its bounds—bounds that the Supreme Court has drawn with unmistakable clarity:

[The clearly erroneous] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*" *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123 [89 S.Ct. 1562, 1576, 23 L.Ed.2d 129] (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City,* 470 U.S. at 573–74, 105 S.Ct. at 1511 (1985). Instead of following this clear teaching, our Court has set itself up as the trier of fact in this case. While purporting to accept the district court's credibility determinations, our Court actually rejects them without admitting that it is doing so. This conclusion is inescapable, because the prosecutors consistently testified that they did not strike any of the black jurors *qua* blacks, but struck them for other, permissible reasons. The district court credited the testimony of the prosecutors and found that their expla-

nations were racially neutral and not pretextual. Thus, it is impossible to reverse the district court without overturning its credibility determinations. At the very least, our Court should acknowledge what it is doing and should demonstrate why, unlike the district court, it thinks the prosecutors' testimony—that they did not strike any black juror simply because the defendant is black—is unworthy of belief.

To sum up, the district court, after an extensive *Batson* hearing, found that the prosecution had articulated neutral reasons related to the particular case for its peremptory challenge of Brooks, and that these reasons were not pretextual. I cannot agree that these findings are clearly erroneous, and I therefore would affirm the decision of the district court.

BEAM, Circuit Judge, dissenting, joined by BOWMAN, Circuit Judge.

I join Judge Bowman's well-reasoned dissent. I write separately only to express my concerns with reference to the nature and scope of a "Batson" hearing as apparently presently required by this circuit.

When *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) applied the holdings of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) retroactively, this circuit remanded pending cases which had not become final on direct appeal. *See, e.g., United States v. Davis,* 816 F.2d 433 (8th Cir.1987); *United States v. Wilson,* 816 F.2d 421 (8th Cir.1987). Unfortunately, as in this case, the remand opinions seem to indicate a need for an evidentiary hearing which includes, as in this case, a testimonial exercise complete with the examination and cross-examination of the prosecutor, under oath, by defense counsel.[1] Such a procedure seemingly requires the river to rise higher than its source since *Batson* imposes no such requirement.

---

1. In most, if not all, of our cases remanded as a result of *Griffith,* we state that after the " 'neutral explanation' for the peremptory strikes" is made, "[t]he defendant must then be given the chance to rebut the proffered explanation as a pretext." *Davis,* 816 F.2d at 434. Apparently, this mandate has, understandably, been read by many district courts to require a full blown evidentiary hearing that permits a trip by the defense attorney through the inner recesses of the prosecutorial mind. However, except for the reference to Title VII procedures in footnote 21 of *Batson,* I find nothing in *Batson* that states, or even infers, that a testimonial procedure to rebut an allegedly pretextual explanation is required or desirable. Indeed, at the

**1128**

If a prima facie case of invidious discrimination is established, in the manner outlined by *Batson,* the prosecutor is simply required to "articulate a neutral explanation related to the particular case" being tried. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724. Such explanation becomes the focus of the credibility test referred to in *Batson. See Id.* at n. 21.[2] Proper practice, in my view, would permit counsel for the defendant to orally respond to this articulation, the response being limited to matters before the court through pre-trial questionnaires or the voir dire examination. If necessary, the trial judge may ask (or permit counsel to ask) venirepersons additional questions prior to ruling on any *Batson* issues raised. However, as explained by Justice Powell, in response to arguments dealing with administrative difficulties imposed by *Batson,* the inquiry was not to become, in effect, a trial within a trial.

The procedures established by *Batson,* as opposed to those seemingly developed by this circuit, are well designed to accommodate the search for a fair jury within the context of reasonable trial management practices. And, the trial judges of this circuit, who are among the best in the federal system, are capable of fairly and reasonably administering the *Batson* requirements for the benefit of both the criminal defendant and the government.

Thus, I would disregard much of the improperly garnered testimonial work product gathered at the two-day *Griffith* trial; credit the explanation given by the prosecutor as was done by the trial judge; set aside, for the future, the evidentiary rebuttal procedure imposed as a result of our earlier efforts to accommodate *Griffith;* and affirm the trial court in this case.

point that the prosecutor is required to articulate a purportedly neutral reason for a strike, the defense is operating with the benefit of a prima facie finding of invidious discrimination that must be credibly overridden in the mind of the trial judge.

2. And, as carefully explained by Judge Bowman, *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) dictates that the trial judge's credibility rulings, made as a result of the *Batson* inquiry, "can virtually never be clear error." *Id.* at 575, 105 S.Ct. at 1512.