931 F.2d 506
 Reather REYNOLDS, as Administratrix of the Estate of John
Willie Reeves, deceased, and in her own behalf, Appellant,
v.
J.W. BENEFIELD, Individually and in an official capacity as
elected member of the Little Rock City Board of Directors;
Charles Bussey, Individually and in an official capacity as
elected member of the Little Rock City Board of Directors;
Brad Furlow, Sergeant; E.H. Hale a/k/a "Doc"; Tom Milton,
Individually and in an official capacity as elected member
of the Little Rock City Board of Directors; Sharon Priest,
Individually and in an official capacity as elected member
of the Little Rock City Board of Directors; Thomas Prince,
Individually and in an official capacity as elected member
of the Little Rock City Board of Directors; Lottie L.
Shackleford, Individually and in an official capacity as
elected member of the Little Rock City Board of Directors;
Joe Thomas, Lieutenant; F.G. Villines, Individually and in
an official capacity as elected member of the Little Rock
City Board of Directors, a/k/a "Buddy"; City of Little
Rock; Walter E. Simpson, a/k/a "Sonny", Appellees.
 No. 90-2309.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 8, 1991.
Decided April 30, 1991.
 
 Arkie Byrd, Little Rock, Ark., for appellant.
 Thomas M. Carpenter, Little Rock, Ark., for appellees.
 Before ARNOLD and FAGG, Circuit Judges, and RE,* Chief Judge.
 RE, Chief Judge.
 
 
 1
 Plaintiff-appellant, Reather Reynolds, as administratrix of the estate of her son John Willie Reeves and in her own behalf, appeals from an order of the United States District Court for the Eastern District of Arkansas. The order denied a new trial in an action brought by Reynolds, under 42 U.S.C. Sec. 1983, against the defendants-appellees, the City of Little Rock and various Little Rock police officers and City officials (the City).
 
 
 2
 The district court's order was entered after an evidentiary hearing conducted pursuant to the judgment of this court in Reynolds v. City of Little Rock, 893 F.2d 1004 (8th Cir.1990). In Reynolds, we reviewed the district court's entry of judgment for the City after a jury verdict in the City's favor. On appeal, we vacated the judgment of the district court to the extent that the judgment permitted the City to use its peremptory challenges to remove two black members of the jury venire, without explaining why the challenges were not racially motivated. We remanded the case to the district court for a determination as to whether the challenges by the City were racially motivated, and, therefore, whether Reynolds was entitled to a new trial. See id. at 1009.
 
 
 3
 On this appeal from the district court's order, Reynolds contends that the district court erred in finding that the challenges were not racially motivated, and, consequently, that Reynolds was not entitled to a new trial.
 
 
 4
 The question presented is whether the district court was clearly erroneous in its finding that the City's peremptory challenges of the two black members of the jury venire were not racially motivated.
 
 
 5
 Since we conclude that the district court was not clearly erroneous in finding that the City's peremptory challenges of the two black members of the jury venire were not racially motivated, we affirm the district court's order denying a new trial.
 
 BACKGROUND
 
 6
 This lawsuit arose out of the shooting death of John Willie Reeves, a black man, by certain police officers of the City of Little Rock. The administratrix of Reeves' estate, Reeves' mother Reather Reynolds, brought suit pursuant to 42 U.S.C. Sec. 1983 against the City of Little Rock and various Little Rock police officers and City officials (the City). After a trial, the jury found for the City and all defendants, and the court entered judgment for the defendants. Reynolds appealed the judgment of the district court to this court, contending that the City had improperly used its peremptory challenges to remove two black members of the jury venire.
 
 
 7
 On that appeal, we noted that, at trial, Reynolds objected to the City's peremptory challenges of the two black members of the jury venire. The district court asked the City to explain its challenges, but the City "declined to explain, asserting that 'we do not have to justify the use of peremptories in a civil case of this manner.' " Reynolds, 893 F.2d at 1008.
 
 
 8
 We then considered whether the rule enunciated by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), should be applied to the City in this case. We noted that in Batson, the Supreme Court "held that '... the State's privilege to strike individual jurors through peremptory challenges[ ] is subject to the commands of the Equal Protection Clause.' " Reynolds, 893 F.2d at 1008 (quoting Batson, 476 U.S. at 89, 106 S.Ct. at 1719). We rejected the City's argument that the Batson rule should be limited to criminal cases, and noted that "[t]he distinction that is crucial for application of equal-protection principles is that between governmental actors and private actors." Id. We added that "[t]he more natural reading of Batson is that its rule of non-discrimination applies only to governmental actors, without distinguishing criminal and civil legal proceedings." Id. Hence, we concluded that "the actions of government counsel in purposefully removing black jurors through peremptory challenges violates the Equal Protection Clause, whether the exclusion occurs in a criminal or a civil case." Id.
 
 
 9
 In light of our conclusion that the Batson rule applied in this civil case, we held that the City had an obligation to explain its peremptory challenges of the two black members of the jury venire. See id. at 1009. Hence, we vacated the district court's judgment "insofar as it adopts the position that the City need not explain its peremptory challenges against black jurors." Id. We remanded with instructions that the district court determine whether Reynolds had established a prima facie case of racial discrimination. We stated that if the court found a prima facie case of discrimination, "it should then conduct a hearing pursuant to the evidentiary standards articulated in Batson." Id. (citation omitted). We added that "[i]n the event that the District Court believes that the City's peremptory challenges were racially motivated, it should order a new trial." Id.
 
 
 10
 On June 28, 1990, pursuant to our remand, the district court conducted a hearing, and determined that on the basis of the transcript of the jury trial, Reynolds had established a prima facie case of discrimination.
 
 
 11
 The City, in rebutting the prima facie case, elicited the testimony of Walter E. Simpson, the former Chief of the Little Rock Police Department (LRPD), who is a defendant in this case. Chief Simpson testified that he was present in the courtroom during the selection of the jury, and that he was instructed by counsel for the City to observe the potential jurors to determine "who might appear to be, for whatever the reason, biased against us."
 
 
 12
 Chief Simpson testified that a check of the records of the LRPD was performed on the members of the jury venire. He added that the records revealed that one Clendetta J. Bonner, who had the same name and date of birth as Clendetta J. Bonner, one of the two black members of the jury venire, had a prior arrest on a misdemeanor charge by the LRPD. Chief Simpson indicated that the City challenged Ms. Bonner because of the defendants' concern that she may have been biased as a result of a previous arrest by the LRPD.
 
 
 13
 Chief Simpson also testified as to his impressions of Clem Cooney, the other black member of the jury venire who was challenged by the City. He stated that he was initially concerned about Mr. Cooney because he was "familiar with and acquainted with members of the Cooney family, one of which is in the penitentiary today and others who have served time and have been charged by LRPD with criminal offenses." He added that a check of the LRPD records revealed that Mr. Cooney had no criminal history.
 
 
 14
 Chief Simpson testified as follows as to his impression of Mr. Cooney:
 
 
 15
 He * * * spent a great deal of time looking at the defense table and the parties there. He seemed to be paying more attention to what we were doing, in my opinion, than he was to the Court's examination and subsequent examination by plaintiff's counsel and defense counsel.
 
 
 16
 * * * * * *
 
 
 17
 He eventually settled in to just what I would consider almost a direct stare at the defense table, as opposed to paying attention to the questions that were being asked.
 
 
 18
 The City also presented the testimony of Brad Furlow, a Sergeant with the LRPD who was also a defendant in the case. Sergeant Furlow stated that he was present during the jury selection, and that he attempted to make eye contact with all the potential jurors. He stated that he made eye contact with Mr. Cooney, and "[w]hen I got eye contact with him it was as if he were glaring, if you will, at me." Sergeant Furlow testified that he told counsel for the City that he was "uneasy" with Mr. Cooney as a juror, and that he believed that the City should challenge him.
 
 
 19
 The third witness presented by the City was Edward Adcock, the Assistant City Attorney who conducted the trial for the City in this case along with his co-counsel, Victra Fewell. Mr. Adcock stated that he and Ms. Fewell discussed the types of jurors they wanted in this case. He added that he and Ms. Fewell agreed to attempt to get middle aged or elderly people, and that "[w]e preferred solid, middle class citizens, people that we thought would be sympathetic to law enforcement, sympathetic to the idea of order in society." He also stated that he and Ms. Fewell "did not discuss exercising peremptories on any race."
 
 
 20
 Mr. Adcock stated that during the voir dire process he observed Mr. Cooney closely, and that he and Mr. Cooney were seated only three or four feet apart from each other. Mr. Adcock gave this description of Mr. Cooney:
 
 
 21
 He was slouched down in the chair. His legs were thrown out to the side. He looked bored, disinterested and over a period of time as I watched him, it was my impression that he was overtly hostile * * * [t]o me and to the defense, to my clients. * * * [H]e appeared to find the whole process distasteful. He didn't want to be close to us, it seemed to me.
 
 
 22
 The final witness called by the City was Ms. Fewell. Ms. Fewell testified that after she obtained the names of the members of the jury venire, she directed that each name be processed through the LRPD files to determine whether any potential jurors had been previously arrested by the LRPD.
 
 
 23
 On June 29, 1990, the court issued an order denying a new trial, thereby letting the judgment for the City stand. As to the peremptory challenge of Ms. Bonner, the court first noted that it appeared that Ms. Bonner had been previously arrested by the LRPD. The court also noted that during the jury selection, the court had asked all the potential jurors whether they "ever had any personal difficulties with the [LRPD], any kind of controversy or any kind of dealings with the [LRPD] in any way that might cause you to be biased either for or against them?" Ms. Bonner did not respond to the court's inquiry.
 
 
 24
 The court concluded that Ms. Bonner's failure to respond to the court's inquiry, "in addition to the fact of her arrest, was ample justification for striking this juror, since the actions of the [LRPD] constitute the crux of this lawsuit." The court added that "race played no part in the rejection of this juror."
 
 
 25
 As to the peremptory challenge of Mr. Cooney, the court noted that Chief Simpson, Sergeant Furlow, and Mr. Adcock had all testified that Mr. Cooney had stared or glared at them, and that they were convinced that Mr. Cooney was biased against them. The court found that the peremptory challenge of Mr. Cooney was not made on the basis of his race. Hence, the district court concluded that "a new trial is denied since [the court] find[s] as a factual matter that no racial motivation existed in the peremptory challenges," which were used to remove the two black members of the jury venire.
 
 DISCUSSION
 
 26
 In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the petitioner, a black man, appealed his conviction for the crimes of burglary and receipt of stolen goods after a verdict from an all-white jury. At trial in the Kentucky state court, the prosecution had used its peremptory challenges to strike all four black members of the jury venire. On certiorari, the Supreme Court considered "the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury." Id. at 82, 106 S.Ct. at 1714.
 
 
 27
 The Court in Batson noted that the equal protection clause prohibits states from striking black members of a jury venire "on the assumption that they will be biased in a particular case simply because the defendant is black." Id. 476 U.S. at 97, 106 S.Ct. at 1723. The Court added that "[t]he core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." Id. at 97-98, 106 S.Ct. at 1723. The Supreme Court concluded that, in making peremptory challenges against black members of the jury venire, the prosecution "must articulate a neutral explanation related to the particular case to be tried." Id. at 98, 106 S.Ct. at 1724. Hence, the Court remanded the case to the trial court to determine whether the peremptory challenges of all black members of the jury venire were racially motivated. See id. at 100, 106 S.Ct. at 1725.
 
 
 28
 In United States v. Wilson, 853 F.2d 606 (8th Cir.1988), a panel of this court reversed the conviction of the defendant, a black man, after a trial before an all-white jury. The panel reversed on the ground that the prosecution, in violation of the Batson rule, had exercised racially motivated peremptory challenges against all the black members of the jury venire. See id. at 612-13. In commenting on the application of the Batson rule or standard in particular cases, the panel stated that a district court:
 
 
 29
 must compare the characteristics of the individual which prompted the Government's strike with characteristics of those not struck by the Government. In order to have a neutral explanation, the characteristics of the struck individual cannot be present in those white panel members not struck by the government.
 
 
 30
 Id. at 610. This court, however, agreed to rehear the Wilson case en banc, and the panel opinion was therefore automatically vacated. See United States v. Wilson, 861 F.2d 514 (8th Cir.1988).
 
 
 31
 On rehearing, the conviction was again reversed and the case was remanded. See United States v. Wilson, 884 F.2d 1121 (8th Cir.1989). We noted that on review of a district court's determination on a Batson issue, the district court's factual findings of intentional discrimination will not be reversed unless they are clearly erroneous. See id. at 1124 (citing Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21). We added that " '[s]ince the trial judge's findings ... largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' " Id. (quoting Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21). Hence, as the standard of review, we have consistently applied the clearly erroneous standard as to a district court's findings of fact as to whether peremptory challenges of members of a jury venire were racially motivated. See, e.g., United States v. Sherrills, 929 F.2d 393, 395 (8th Cir.1991); United States v. Johnson, 905 F.2d 222, 223 (8th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 304, 112 L.Ed.2d 257 (1990); United States v. Nicholson, 885 F.2d 481, 482 (8th Cir.1989).
 
 
 32
 Regarding the peremptory challenge of venire member Clendetta J. Bonner, we conclude that the district court was not clearly erroneous in its finding that the prosecution's challenge of Ms. Bonner was not racially motivated. The record reveals that Ms. Bonner had the same name and birthdate as one Clendetta J. Bonner who had been previously arrested on a misdemeanor charge by the LRPD. The record also disclosed that Ms. Bonner remained silent in response to the following question from the court directed to all members of the jury venire:
 
 
 33
 Have any of you ever had any personal difficulties with the [LRPD], any kind of controversy or any kind of dealings with the [LRPD] in any way that might cause you to be biased either for or against them? Have you had any dealings with the [LRPD] because, as you can tell, they are deeply involved in this matter?
 
 
 34
 Reynolds contends that Ms. Bonner's silence in response to this question was an insufficient reason to justify the prosecution's peremptory challenge, since "[a] reasonable juror could easily have interpreted this question as asking, not if she had ever been arrested by the police, but whether her contact with the police, including any arrest she may have experienced, was such as to cause her 'to be biased either for or against' the police." (emphasis in original). Ms. Bonner's failure to respond to the court's inquiry, however, is not the only reason given by the City in its explanation of the peremptory challenge. Her response to the question concerning her birthdate caused the City to be genuinely concerned that, since it appeared that Ms. Bonner had been previously arrested by the LRPD, she might harbor resentment or hostility against those defendants who were members of the LRPD.
 
 
 35
 Reynolds also contends that, because of the concept of "comparability," the district court erred in its conclusion that the peremptory challenge of Ms. Bonner was not racially motivated. Reynolds submits that "the government must establish that any reason given for its exercise of strikes against black jurors had been equally applied to similarly situated white jurors; in the absence of such a demonstration of 'comparability,' the state's reasons will be exposed as pretexts for discrimination."
 
 
 36
 In this circuit, it is well established that the government may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics, are also challenged. See Garrett v. Morris, 815 F.2d 509, 513-14 (8th Cir.), cert. denied sub nom. Jones v. Garrett, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987).
 
 
 37
 In this case, the testimony at the hearing indicated that the names of all members of the jury venire were processed through the records of the LRPD to determine whether any had previously been arrested by the LRPD. It is undisputed that no similar inquiry was performed on the records of other local police departments, and it is also undisputed that several white members of the jury venire were not Little Rock residents. Reynolds contends that the City's practice amounts to a violation of the concept of "comparability."
 
 
 38
 That the City processed the names of the members of the jury venire only through the LRPD files, however, does not amount to a violation of the concept of "comparability." Ms. Fewell testified that similar inquiries were not made of other police departments because "as * * * a practical matter, there was very little way for me to check all these other jurisdictions that these people * * * come from." Ms. Fewell added that other police departments were sometimes unwilling to process names through their arrest files.
 
 
 39
 As to the peremptory challenge of venire member Clem Cooney, the testimony at the hearing is sufficient to support the district court's conclusion that the City's actions were not racially motivated. Three witnesses presented by the City, who were present at the jury selection, testified as to their observations of Mr. Cooney's demeanor or body language which led them to conclude that he was biased against them.
 
 
 40
 It is well to note that feelings are not always expressed in words, and, indeed, may be clearly manifested by gestures and facial expressions. A grimace or stare may express hostility or displeasure quite as clearly as words shouted across a room. Much literature may be found on interpreting "body language" as a fundamental and effective practice in the selection of a jury. See, e.g., 1 S. Schweitzer, Cyclopedia of Trial Practice Sec. 144 (2d ed. 1970); 5 Am.Jur.Trials Sec. 65 (1966) (valuable information can be obtained by observing a juror's demeanor). It has been noted that the "body language method" of jury selection "looks to a juror's appearance, behavior, and non-verbal responses, since these are viewed as giving a truer picture than verbal answers." T. Mauet, Fundamentals of Trial Techniques 32 (2d ed. 1988). It may also be relevant to note "the juror's attitude toward the lawyer." Id.
 
 
 41
 Reynolds, however, contends that the district court erred in concluding that the challenge of Mr. Cooney was not racially motivated. Reynolds asserts that Mr. Cooney was challenged because of the concern of the defendants that he may have been a member of family named Cooney which, according to the defendants, has several members who have been arrested by the LRPD. Reynolds notes that the City made no attempt to verify whether Mr. Cooney was a member of this family, and the City's lack of verification was "particularly significant, because as [the defendants] testified, their suspicions led them to focus or 'key in' on [Mr.] Cooney among the members of the jury."
 
 
 42
 It is not disputed that both Chief Simpson and Sergeant Furlow testified that, upon hearing Mr. Cooney's last name at the jury selection, they became concerned that Mr. Cooney may have family members who had been arrested by the LRPD. The transcript of the hearing, however, indicates that this was not the reason the City challenged Mr. Cooney. Rather, Mr. Cooney was challenged because of the definite impression of the defendants that his facial expressions and body language indicated hostility.
 
 
 43
 Finally, we note that during oral argument, counsel for Reynolds submitted that the grounds asserted for the challenge of Mr. Cooney were "subjective" or "murky."
 
 
 44
 In United States v. Sherrills, we reviewed the conviction of the defendant for the possession of narcotics. At jury selection, the prosecution had used its peremptory challenges to remove three black members of the jury venire on the ground of "inattentiveness." On appeal, the defendant contended that the conviction should be reversed because the peremptory challenges were racially motivated. See 929 F.2d at 395. In Sherrills, we noted our concern that the use of "subjective judgments" to explain peremptory challenges is "particularly susceptible to the kind of abuse prohibited by Batson." Id. We added that, hence, counsel should "fully develop the record concerning the specific behavior by venire members motivating counsel to make a peremptory challenge * * *." Id. at 395. After our review of the record in Sherrills, we concluded that the district court's findings that the challenges were not racially motivated were not clearly erroneous. See id. at 395.
 
 
 45
 As in Sherrills, we reiterate our concern that the Batson rule be applied in this circuit, and that the government not be permitted to exercise peremptory challenges of members of a jury venire for reasons "which arise solely from the jurors' race." Batson, 476 U.S. at 98, 106 S.Ct. at 1723. Nevertheless, in this case, the transcript of the hearing indicates that the City's explanations for its challenge of Mr. Cooney were not pretextual or unfounded. To say that the City's challenge of Mr. Cooney was solely subjective would be inaccurate, since the challenge reflected a judgment based upon specific observations which indicated that Mr. Cooney may have harbored hostility towards the defendants.
 
 
 46
 On this record we conclude that the district court's finding that the peremptory challenge of Mr. Cooney was not racially motivated is not clearly erroneous.
 
 CONCLUSION
 
 47
 Since we conclude that the district court was not clearly erroneous in finding that the City's peremptory challenges of the two black members of the jury venire were not racially motivated, we affirm the district court's order denying a new trial.
 
 
 
 *
 The Hon. Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation