**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leo BISHOP, Defendant–Appellant.**

**No. 89–50560.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1991.

Submission Vacated May 1, 1991.

Resubmitted Sept. 4, 1991.

Decided March 25, 1992.

Carlton F. Gunn, Deputy Federal Public Defender, Los Angeles, Cal., for defendant-appellant.

Robert L. Brosio, and John S. Gordon, Asst. U.S. Attys., Los Angeles, Cal., for plaintiff-appellee.

Before: BROWNING, D.W. NELSON and REINHARDT, Circuit Judges.

D.W. NELSON, Circuit Judge:

With this case, we are called upon to examine the boundaries of the Supreme Court's decision in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant Leo Bishop alleges that the prosecutor in his criminal trial unconstitutionally exercised a peremptory challenge to exclude a prospective black juror on the basis of her race. The prosecutor explained the challenge as based in part on the fact the black juror lived in a predominantly low-income, black neighborhood and was therefore likely to believe the police "pick on black people." We must determine whether this constituted an adequate race-neutral explanation for the strike.[1] Guided by the Court's recent analysis in *Hernandez v. New York,* —— U.S. ——,

---

1. Whether the justification offered by a prosecutor is an adequate race-neutral explanation is a question of law. *See United States v. Johnson,* 941 F.2d 1102, 1108 (10th Cir.1991).

111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), we hold that it did not and now reverse.

## I

Leo Bishop was tried and convicted on three narcotics trafficking counts and six counts of assault on a federal officer. On appeal, he disputes both the sufficiency of the evidence on the assault charge and the constitutionality of the government's use of a peremptory challenge.

Jury selection began on July 25, 1989. Out of a possible seven peremptory challenges, the government exercised five. Three were used to strike white jurors; the remaining two were directed at black jurors. Citing *Batson,* defense counsel objected to the last challenge aimed at Ms. Burr, a black eligibility worker living in Compton. He moved for a mistrial or, in the alternative, the reseating of the challenged juror.

The prosecutor then volunteered an explanation for his decision. He stated that he felt that an eligibility worker in Compton

> is likely to take the side of those who are having a tough time, aren't upper middle class, and probably believes that police in Compton in South Central L.A. pick on black people.
>
> To some extent the rules of the game down there are probably different than they are in upper middle class communities. And they probably see police activity, which is, on the whole, more intrusive than you see in communities that are not so poor and violent.

Excerpt of Record ("E.R.") at 21. In response to a question from the bench, he added that "her primary sympathy ... is likely to lay with people whom she comes into contact with every day." *Id.* at 30.

In addition, the prosecutor pointed to the fact that Ms. Burr's husband was himself an eligibility worker and, later in the hearing, suggested that her age was also a factor in his decision, because it was approximately that of the defendant's mother. *Id.* at 25. Finally, in support of his contention that he had not stricken Ms. Burr on the basis of race, he stressed that two blacks remained on the jury and asserted both that he would not have challenged a black eligibility worker from an affluent community and that he would have challenged a white eligibility worker from Compton. *Id.* at 27, 33.

Defense counsel reiterated his concern, contending that the reasons provided by the government were not race-neutral. Specifically, in view of the fact that approximately three quarters of Compton's population was black, he argued that residence in this case served as a mere surrogate for race.[2]

The trial judge, while questioning the logic behind the prosecutor's actions and expressing some concern over Compton's racial composition, accepted his statement as to the government's motives.[3] The judge also apparently believed that, even if the grounds for striking Ms. Burr were "questionable," he should let the case proceed "if the jury still ends up being representative." *Id.* at 31, 34. In other words, the impermissible striking of a juror would constitute harmless error if the proportion of blacks on the final jury panel was at least as great as their proportion on the original venire. *Id.* at 31, 34–35.

At the close of the trial, the court returned to this issue anew, explaining:

> I served for 14 months in the Superior Court in Compton. I got to know those people rather well there. And I can tell you that the majority of the people that live there are law-abiding people. They are very concerned about the safety of their community.

E.R. at 23. However, he then made it clear that he accepted the prosecutor's explanation, stating: "If he tells me those are his reasons, I believe that those were his reasons." *Id.* at 25.

---

**2.** According to data from the Department of Commerce, in 1980 74.8% of Compton's population was black. *County and City Data Book* 1988, Table C.

**3.** The judge gave little weight to the age factor, noting that several non-stricken jurors shared that characteristic. E.R. at 25. On the question of residence, he remarked:

[E]ven if the excusal of the one juror would be deemed improper, and I don't say that it is, but even if it's deemed improper by review of some appellate court, it's this court's belief that the defendants have not thereby been deprived of representative jurors. So it's a no-harm, no-foul situation in my opinion.

*Id.* at 116. At that point, the prosecutor remarked that after striking Ms. Burr, he did not strike Ms. Bryant who also was a black eligibility worker—only this time, living in Van Nuys, and married to someone who worked for the Sheriff's Department. *Id.* at 117.

Appellant's motion concerning discriminatory use of peremptory challenges was denied and, on August 1, 1989, the jury found him guilty of the three cocaine charges and six counts of assault on a federal officer. Bishop timely appealed.

## II

"For over a century, [the Supreme Court] has been unyielding in its position that a defendant is denied equal protection of the laws when tried before a jury from which members of his or her race have been excluded by the State's purposeful conduct." *Powers v. Ohio*, 499 U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). In

case after case, the Court has imbued this generous principle with concrete meaning, applying it to the exercise of peremptory challenges, *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), allowing a defendant to raise a constitutional challenge premised on discriminatory jury strikes occurring in the course of his own trial, *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722, permitting objections to challenges against prospective jurors of a race other than the defendant's, *Powers*, and extending the rule to civil trials. *Edmonson v. Leesville Concrete Co.*, —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

Bishop's claim focuses on the use of a criterion closely tied to race and raises the following question: Under what circumstances does such a criterion cease being race-neutral and become a surrogate for impermissible racial biases? [4] The Supreme Court has never directly addressed this issue.[5] Nevertheless, its discussion in *Hernandez, supra,* provides helpful guidance.

In *Hernandez*, the defendant objected to the prosecutor's use of two peremptory challenges to exclude Latino venirepersons. Explaining his decision, the prosecutor stated that he feared the potential jurors, be-

---

**4.** Contrary to the defendant in *Batson,* Bishop does not base his claim on the equal protection clause because he is a *federal* defendant. However, the Constitution's equal protection guarantees remain applicable via the due process clause of the fifth amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 498–500, 74 S.Ct. 693, 694–695, 98 L.Ed. 884 (1954). "[W]e approach equal protection claims under the fifth amendment in the same fashion as such claims under the fourteenth amendment." *U.S. v. De Gross,* 913 F.2d 1417, 1421 n. 7 (9th Cir.1990) (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975)), *reh'g en banc granted,* 930 F.2d 695 (9th Cir.1991).

**5.** The Court did deny certiorari in a case presenting a somewhat analogous situation. In *Ex Parte Lynn,* 543 So.2d 709 (Ala.1988), the Alabama Court of Criminal Appeals affirmed a trial court's determination that a prosecutor's exercise of peremptory strikes to exclude black jurors living in the defendant's neighborhood was permissible under *Batson.* The prosecutor had explained that the prospective jurors might have known the defendant.

Dissenting from the Supreme Court's denial of certiorari, Justice Marshall had the following to say:

Mere place of residence, or any other factor closely related to race, should not be regarded as a legitimate basis for exercising peremptory challenges without some corroboration on *voir dire* that the challenged venirepersons actually entertain the bias underlying the use of that factor. This is true particularly when, as in this case, the prosecutor can easily ascertain the existence of the alleged bias without use of the overly broad proxy for bias.

493 U.S. 945, 110 S.Ct. 351, 352, 107 L.Ed.2d 338 (1989) (Marshall, J., dissenting).

For reasons that will be explained in this opinion, we find that there are critical differences between the instant case and *Lynn.* In any event, the precedential value of this Alabama Court of Criminal Appeals decision is negligible: the Supreme Court repeatedly has stated that its denial of certiorari has no precedential effect and indicates nothing about the merits of a case. *See, e.g., Hopfmann v. Connolly,* 471 U.S. 459, 460, 105 S.Ct. 2106, 2107, 85 L.Ed.2d 469 (1985).

cause they were bilingual, might not defer to the translator as "the final arbiter of what was said by each of the witnesses." 111 S.Ct. at 1864–65. The defendant maintained that this justification served to conceal a race-based exclusion, given the inextricable link between ethnicity and Spanish-language ability. *Id.* at 1866. The Supreme Court disagreed.

After noting that discriminatory impact alone could not suffice to establish an equal protection violation, *id.* at 1866, the Court turned to the heart of Hernandez' argument:

> Petitioner argues that Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the Equal Protection Clause to exercise a peremptory challenge on the ground that a Latino potential juror speaks Spanish. He points to the high correlation between Spanish-language ability and ethnicity in New York, where the case was tried. We need not address that argument here, for the prosecutor did not rely on language ability without more, but explained that the specific responses and the demeanor of the two individuals during *voir dire* caused him to doubt their ability to defer to the official translation of Spanish-language testimony.

> The prosecutor here offered a race-neutral basis for these peremptory strikes. As explained by the prosecutor, the challenges rested neither on the intention to exclude Latino or bilingual jurors, nor on stereotypical assumptions about Latinos or bilinguals. The prosecutor's articulated basis for these challenges divided potential jurors into two classes: those whose conduct during *voir dire* would persuade him they might have difficulty in accepting the translator's rendition of Spanish-language testi-

mony and those potential jurors who gave no such reason for doubt.

*Id.* at 1866–67 (footnote omitted).

With the help of these considerations, we now turn to Bishop's claim.

### III

■ *Batson* describes a three-part analysis to determine whether the prosecutor's peremptory strike violates the Constitution. Initially, the defendant must establish a prima facie case of purposeful discrimination. 476 U.S. at 96–97, 106 S.Ct. at 1722–23. Next, the prosecutor must explain the challenges on race-neutral grounds. *Id.* at 97–98, 106 S.Ct. at 1723–24. Finally, it is up to the trial court to "determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. at 1723.

### A

■ Ordinarily, when a defense counsel contends that a prosecutor's exercise of a peremptory challenge violates equal protection principles, he must first establish a prima facie case of discrimination.[6] In this instance, although the district court suggested that the government would be required at some point to provide an explanation, and although the prosecutor immediately volunteered one, the district court did not rule on the prima facie question. As the Court explained in *Hernandez*, this slight deviation is immaterial. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." 111 S.Ct. at 1866; *see also United States v. Lane*, 866 F.2d 103, 105 (4th Cir.1989); *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987).

---

**6.** To establish a prima facie case, the defendant must illustrate "that he is a member of a cognizable racial group," *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722, that the prosecutor has removed members of his race, *but see Powers, supra,* and that the circumstances of jury selection "raise

an inference that the prosecutor used [the challenges] to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722; *see also United States v. Power*, 881 F.2d 733, 739–40 (9th Cir.1989).

## B

The crux of this case is whether the prosecutor's explanation was race-neutral, the second of the *Batson* factors. Appellee contends that it was, emphasizing that he did not challenge Ms. Burr because she was black, but (at least in part) because she lived in Compton, a poor and violent community whose residents are likely to be "anesthetized to such violence" and "more likely to think that the police probably used excessive force." Relying on *Hernandez,* he argues that the high correlation between residence in Compton and race is immaterial. Therefore, his explanation must be deemed permissible.

We disagree. Appellee has offered only a partial reading of *Hernandez,* breaking off at mid-sentence. Indeed, in concluding the plurality opinion, Justice Kennedy noted:

> We would face a quite different case if the prosecutor had justified his peremptory challenge with the explanation that he did not want Spanish-speaking jurors.... [A]s we make clear, a policy of striking all who speak a given language without regard to the particular circumstances of the trial or the individual responses of the jurors, may be found by the trial judge to be a pretext for racial discrimination.

*Id.* 111 S.Ct. at 1872–73. The prosecutor in *Hernandez,* in other words, did not rely on Spanish proficiency alone. He justified his decision by pointing to the prospective jurors' avowed uncertainty as to whether they could set aside their own understanding of Spanish and listen only to the interpreter's version. Thus, there was a nexus between the jurors' characteristic—bilingualism—and their possible approach to the specific trial.

No such nexus can be found here. For this case to be controlled by *Hernandez,* the government would have had to believe, based on Ms. Burr's conduct during *voir dire,* (1) that she had witnessed or heard of incidents of violence or police behavior in Compton, and (2) that as a result, she would have found it difficult to assess the credibility of a particular witness fairly and impartially. *See* 111 S.Ct. at 1867. For example, her responses to certain questions might have given rise to the prosecutor's impression. In contrast, the proffered reasons (that people from Compton are likely to be hostile to the police because they have witnessed police activity and are inured to violence) are generic reasons, group-based presuppositions applicable in all criminal trials to residents of poor, predominantly black neighborhoods. They amounted to little more than the assumption that one who lives in an area heavily populated by poor black people could not fairly try a black defendant.

To strike black jurors who reside in such communities on the assumption they will sympathize with a black defendant rather than the police is akin to striking jurors who speak Spanish merely because the case involves Spanish-speaking witnesses. The Court in *Hernandez* strongly suggested that more was required—namely, the prosecutor's belief that the particular juror might not accept the proposed translation.[7] *See also Batson,* 476 U.S. at 98, 106 S.Ct. at 1723 ("The prosecutor ... must articulate a neutral explanation related to the particular case to be tried.").

The prosecutor's justification in this case, unlike in *Hernandez,* referred to collective experiences and feelings that he just as easily could have ascribed to vast portions of the African–American community. Implicitly equating low-income, black neighborhoods with violence, and the experience of violence with its acceptance, it referred to assumptions that African–Americans face, and from which they suffer, on a daily basis. Ultimately, the invocation of residence both reflected and conveyed deeply ingrained and pernicious stereotypes. *Compare Hernandez,* 111

---

7. Two Justices in that case apparently disagreed, noting that "the plurality opinion goes farther than it needs to in assessing the constitutionality of the prosecutor's asserted justification for his peremptory strikes." *Hernandez,* 111 S.Ct. at 1873 (O'Connor, J., concurring). The views expressed in the concurrence, had they been adopted by the Court, might have supported the government's position in this case. But they were not.

S.Ct. at 1867. Government acts based on such prejudice and stereotypical thinking are precisely the type of acts prohibited by the equal protection clause of the Constitution. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

This is not to say that residence *never* can constitute a legitimate reason for excluding a juror, even after a prima facie showing of intentional discrimination has been made. On the contrary: What matters is not *whether* but *how* residence is used. Where residence is utilized as a link connecting a specific juror to the facts of the case, a prosecutor's explanation based on residence could rebut the prima facie showing. A trial judge need not believe the explanation to be wise; she need only believe it to be non-pretextual. For example, in *United States v. Mitchell,* 877 F.2d 294 (4th Cir.1989), the government struck five black jurors on account of their residence. Although acknowledging that "this reason could be pretextual because [the] areas are ... predominantly black," *id.* at 303, the trial court found no discriminatory intent. Critical for our purposes is the fact that the government did not use residence as a surrogate for racial stereotypes. Rather, it pointed to the "political prominence and ... remarkable popularity" of the defendant's family in the districts where the prospective jurors lived. *Id.* at 303.[8]

Likewise, in *United States v. Briscoe,* 896 F.2d 1476 (7th Cir.), *cert. denied,* ―― U.S. ――, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990), the court found no discriminatory motive in the use of a peremptory against a black juror because of his residence despite noting that "the west side of Chicago is predominantly black and that exclusion of jurors based solely on their residence in this area of the city could be a pretext for discrimination." *Id,* at 1488. Affirming the trial court's ruling, the Seventh Circuit emphasized that

> the government's explanation for its strike went well beyond a cursory statement that [the juror] resided on the west

side of Chicago. The government explicitly stated that [the juror's] last three separate addresses where he had resided in the immediate past were geographically close to the addresses of [two governmental witnesses].

*Id.* at 1488–89; *see also United States v. Davis,* 871 F.2d 71, 72–72 (8th Cir.1989); *United States v. Tindle,* 860 F.2d 125, 129 (4th Cir.1988).

On the other hand, where residence is utilized as a surrogate for racial stereotypes—as, for instance, a short hand for insensitivity to violence—its invocation runs afoul of the guarantees of equal protection. The difference between *Hernandez, Mitchell* and *Briscoe* on the one hand, and the present case on the other, is the difference between a reason—whether valid or not—and a racial stereotype. It is the difference between a criterion having a discriminatory racial impact, and one acting as a discriminatory racial proxy. It is, in short, the difference between what the Constitution permits, and what it does not.

### C

In so holding, we do not intend to question the "great deference" to which the trial court's factual findings regarding purposeful discrimination in the jury selection are entitled. *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. As the *Hernandez* Court made clear:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.... [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'

111 S.Ct. at 1869 (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985)). Therefore, the findings of the trial judge will not be set aside unless clearly erroneous. *United States v. Power,* 881 F.2d 733, 739 (9th

---

8. The defendants' uncle, scheduled to testify on their behalf, was a Congressman from the district in which four of the jurors resided. As for

the fifth black juror, he lived in a district represented on the City Council by one of the defendants. *Id.*

Cir.1989); *United States v. Lewis,* 837 F.2d 415, 417 (9th Cir.), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988).

But the role of the trial judge in assessing the prosecutor's motive only kicks in once a race-neutral justification has been offered. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723; *see also U.S. v. Wilson,* 884 F.2d 1121, 1124 (8th Cir.1989) (*en banc*). Here, as we have explained, the justification was tainted by impermissible generalizations regarding racial groups and their environment. The trial judge's credibility determinations therefore are not in question. We need not reach the issue whether the prosecutor's explanation was honest or merely a sham; rather, we conclude that, even assuming it was sincere, the government's explanation is not sufficient to satisfy *Batson* because "a discriminatory intent is inherent in the prosecutor's explanation." *Hernandez,* 111 S.Ct. at 1866.

The prosecutor in this case mentioned not only Ms. Burr's residence, but also her age and employment. However, as the district judge noted, "[O]ther ladies possibly the same age" were not challenged and the government did not strike a black eligibility worker who resided in Van Nuys. While residence may sometimes be a valid reason for a challenge, in this case the prosecutor's invocation of residence rested on a stereotypical racial reason. As a result, we cannot find that race was not a factor in his decision. The prosecutor did not meet his burden of articulating a racially neutral explanation for striking Ms. Burr. Pursuant to *Batson,* we must reverse. *Batson,* 476 U.S. at 100, 106 S.Ct. at 1725; *De Gross,* 913 F.2d at 1426; *Wilson,* 884 F.2d at 1124–25.

### IV

■ In this case, the trial judge apparently believed that, the issue of discriminatory intent notwithstanding, *Batson* is satisfied if a "representative jury" remains after jury selection—i.e., if the percentage of blacks on the jury panel is at least as great as the percentage of blacks on the original venire. *See supra.* This is a question of law which we review *de novo. See generally United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

It is true that representativity and, more generally, a prosecutor's acceptance of black jurors, are factors that a trial judge may take as an indication of non-discriminatory motive. *See, e.g., Lane,* 866 F.2d at 106. However, there is a critical distinction between using proportional representation as evidence of the government's sincerity and using it to offset a constitutional violation, thereby rendering the violation somehow harmless. The latter scenario collides with the fundamental principle that "under *Batson,* the striking of *one black juror* for a racial reason violates the Equal Protection Clause." *United States v. David,* 803 F.2d 1567, 1571 (11th Cir.1986) (emphasis added); *see also United States v. Lane,* 866 F.2d 103, 105 (4th Cir.1989); *United States v. Clemons,* 843 F.2d 741, 747 (3rd Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988); *United States v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987); *United States v. Gordon,* 817 F.2d 1538, 1541 (11th Cir.1987), *vacated in part on other grounds,* 836 F.2d 1312 (11th Cir. 1988).[9]

Our holding that the prosecutor's explanation failed to satisfy *Batson's* mandate is therefore not counterbalanced by the racial make-up of the jury panel, and reversal remains necessary.

### V

In our racially diverse society, residence, alas, has come to play a critical role as a bastion of enduring racial segregation. In many ways, residential patterns mirror the unspoken biases and prejudices that continue to plague our minds. While we may not "recognize the ways in which our cultural

9. We note that in districts with low black populations, shielding representative juries from *Batson* review would often deprive black defendants of their constitutional right "merely because of the statistical likelihood that their jury venires will be overwhelmingly non-black." *Clemons,* 843 F.2d at 748 n. 6.

experience has influenced our beliefs about race," Lawrence, *The Id, the Ego and Equal Protection: Reckoning with Unconscious Racism*, 39 Stan.L.Rev. 317, 322 (1987), the color lines that partition our cities bear witness to its destructive effect.

Residence, as it were, often acts as an ethnic badge. As study after study has showed, residence, especially in urban centers, can be the most accurate predictor of race—more accurate, indeed, than social class. *See, e.g.*, Kain, *The Influence of Race and Income on Racial Segregation and Housing Policy*, in Housing Desegregation and Federal Policy 99, 102 (1986); *Note—Racial Diversity in Residential Communities: Societal Housing Patterns and a Proposal for a "Racial Inclusionary Ordinance"*, 63 S.Cal.L.Rev. 1151, 1167–69 (1990). As one commentator remarked, "[O]ne legacy of the [racial] caste system has remained largely intact: the urban ghetto." *Comment—Individual Rights and Demographic Realities: The Problem of Fair Housing*, 82 N.W.L.Rev. 874, 875 (1988).

In turn, such residential segregation nurtures the intolerance from which it springs. Through mental association, African–Americans, their neighborhoods, crime and violence all become amalgamated, giving rise to tenacious stereotypes—innocent and unintentional perhaps, but stereotypes nonetheless. They are and must remain unwelcome in the courtroom.

As the Supreme Court eloquently and vividly reminded us last Term:

> If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury. By the dispassionate analysis which is its special distinction, the law dispels fears and preconceptions respecting racial attitudes. The quiet rationality of the courtroom makes it an appropriate place to confront race-based fears or hostility by means other than the use of offensive

> stereotypes. Whether the race generality employed … to challenge a potential juror derives from open hostility or from some hidden and unarticulated fear, neither motive entails the litigant to cause injury to the excused juror.

*Edmonson*, 111 S.Ct. at 2088.

For these reasons and those explained above, appellant's convictions for the drug trafficking and assault charges are reversed.

## VI

Ordinarily, our resolution of Bishop's *Batson* claim in his favor would end our inquiry—for reasons of judicial economy we would not address additional claims of error. In this instance, however, Bishop claims that the evidence presented in his first trial was legally insufficient to support his convictions for assault on a federal officer. As we have made clear in previous cases, "[t]he existence of other grounds for reversal does not avoid the necessity of reviewing the sufficiency of the evidence." *United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir.1984); *United States v. Hodges*, 770 F.2d 1475, 1477 (9th Cir.1985); *United States v. Perez–Reveles*, 715 F.2d 1348, 1354–55 (9th Cir.1983); *see also Palmer v. Grammer*, 863 F.2d 588, 592 (8th Cir.1988) (listing cases from the Third, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh circuits reaching the insufficiency of evidence question after finding reversible error). The reason for this exception to our general rule is obvious: the defendant who successfully challenges a conviction for insufficiency of the evidence is entitled not only to a reversal of his conviction but also to an order directing the district court to enter a judgment of *acquittal* with respect to that conviction. Under such circumstances, the double jeopardy clause bars the government from retrying the defendant on the charge underlying the conviction. *See Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).[10]

---

**10.** The double jeopardy clause does not, of course, prevent the government from retrying the defendant on charges to which the claim of

insufficient evidence does not go. *See United States v. Harmon*, 632 F.2d 812, 814 (9th Cir. 1980) (per curiam). The government is free to

Because of this bar to retrial, we reaffirm our longstanding rule and turn now to the insufficiency claim before us.[11]

## A

■ In assessing Bishop's claim that the evidence presented at trial was legally insufficient to support a guilty verdict on the charges of assault on a federal officer, our role is to determine "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). Under this standard of review, we conclude that Bishop's convictions for assault on a federal officer cannot stand.

The evidence against Bishop with respect to the six counts of assault on a federal officer is as follows. On March 27, Gregory Briggs and DEA undercover agent Jordan met at a grocery store parking lot in Inglewood, California. Briggs paged Bishop from Jordan's car phone; Bishop arrived a short time later and informed Jordan that he could sell him some cocaine. Jordan insisted on seeing the cocaine before giving Bishop money. Bishop led Jordan to a nearby Chevrolet Blazer; Dwight Weisner was seated in the driver's seat. Bishop told Weisner to hand him the cocaine which Bishop then showed to Jordan. Bishop then sat down in the front passenger seat.

As Jordan walked back toward his car, purportedly to get money for the drug transaction, he gave the pre-arrest signal to the other undercover agents. Two officers drove their cars directly in front of the Blazer in order to block its escape. Another officer ran to a car near the Blazer, pointed his gun at Weisner and yelled, "Police officer, freeze!" Undaunted by this display of force, Weisner started the car, placed it in gear, and drove over the police cars positioned to block his escape. The Blazer headed south, followed closely by a police officer in a patrol unit with its light flashing. Another plainclothes DEA agent stepped in front of the Blazer, and yelled "Police! Freeze!" Weisner did not heed this warning, forcing this agent to retreat behind a cement pillar to avoid being hit by the Blazer, which continued on its southward course.

Agent Jordan was the next to stand in the path of the Blazer. Jordan was the third officer to point his gun at the vehicle. Jordan testified that as the Blazer approached him, Bishop had one hand on the dashboard and the other pointing in Jordan's direction. As the Blazer proceeded onward, Jordan dove between two parked cars in order to avoid being run over. The Blazer struck a car parked to the north of Jordan, although the distance between Jordan and this car is unclear.

After striking the parked car, the Blazer veered southwest. A fourth officer tried

retry Bishop on the drug trafficking charges reversed for *Batson* violations.

**11.** In *Richardson v. United States*, 468 U.S. 317, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), the Supreme Court held that the double jeopardy clause does not bar retrial when the defendant's first trial ends in a mistrial even if the evidence at that trial was legally insufficient to support a guilty verdict. Under *Richardson*, it appears that appellate courts are not *required* to consider sufficiency issues. As Justice Brennan pointed out, this decision has the unfortunate effect of rendering "a defendant who is constitutionally *entitled to an acquittal* but who fails to receive one ... worse off than a defendant tried before a factfinder who demands constitutionally sufficient evidence." *Id.* at 327, 104 S.Ct. at 3087 (Brennan, J., concurring in part and dissenting in part) (emphasis in the original). The *Richardson* court reaffirmed, however, that its

"holding in *Burks* established ... that an appellate court's finding of insufficient evidence to convict on appeal from a judgment of conviction is[,] for double jeopardy purposes, the equivalent of an acquittal." *Id.* at 325, 104 S.Ct. at 3086. Therefore, we find nothing in *Richardson* which *prevents* appellate courts from assessing the sufficiency of the evidence if they so wish. *Cf. United States v. Douglas*, 874 F.2d 1145, 1150 (7th Cir.1989) ("While we recognize the logical and legal merit of the analysis, we are not convinced, in light of *Richardson*, that the Double Jeopardy Clause compels an appellate court to review the sufficiency of the evidence offered at trial anytime a defendant raises the question. We are, nevertheless, in order to accomplish the same purpose, prepared to adopt a policy in this circuit of routinely addressing evidentiary sufficiency in criminal cases when a defendant presents the issue on appeal.").

to block the Blazer's path. The Blazer approached this officer as well, but swerved at the last moment, narrowly missing him. Two more officers blocked the Blazer's path and fired at it as it passed within three feet of them. Finally, the Blazer struck two more cars and slowed down. Bishop and Weisner then simultaneously jumped out of the moving vehicle. They were captured as they attempted to flee on foot.

The jury found Bishop guilty of six counts of assault on a federal officer. Bishop moved for a judgment of acquittal on those counts both at the close of the government's case and at the close of the evidence as a whole. The district court denied both motions. On appeal, the government concedes that the evidence was insufficient to support a conviction for assaulting five of the six federal officers. The government now contends only that the evidence was sufficient to support the jury's verdict on the count involving Agent Jordan. We therefore consider only that count.[12]

### B

In addition to the evidence discussed above, the government points to Bishop's apparent control of the drug transaction, the coordination between his actions and Weisner's (particularly as evidenced by their simultaneous efforts to flee on foot), and his strong interest in escaping arrest as evidence are sufficient to support his conviction. In dropping five counts of assault against Bishop, however, the government has conceded that this evidence alone is insufficient to support a conviction for assault. The only evidence which distinguishes Bishop's participation in the "assault" on Agent Jordan from his participation in the "assaults" on the other agents is Agent Jordan's testimony as to the pointing. Accordingly, the critical question for our analysis is whether this testimony carries enough additional probative weight such that the evidence against Bishop as a whole amounts to sufficient evidence from which a rational jury could conclude that Bishop was guilty beyond a reasonable doubt of aiding and abetting an assault on Agent Jordan.

In the absence of evidence as to why Bishop was pointing, or that Bishop had some role in determining the path of the Blazer, we conclude that the evidence is insufficient to support Bishop's conviction. Agent Jordan's testimony is entirely consistent with a number of reasonable explanations *other* than the conclusion that Bishop pointed at Agent Jordan in order to assist Weisner's attempt to run him over. As Bishop argues, Agent Jordan's observations in no way indicate that he was telling Weisner to "hit that guy over there!" any more than they refute the claim that he was telling Weisner "Look out, he's got a gun!", "Look out, you're going to hit him!", or "Look out, you're going to hit that car!" Taken in the light most favorable to the government, the evidence showed only that Bishop had a strong motive to escape from the police, that he had been in charge of the drug transaction, and that while a passenger in the fleeing vehicle he was seen pointing in the direction of Agent Jordan while the vehicle headed toward Jordan.

As we have previously held, "the government's evidence need not exclude every reasonable hypothesis consistent with innocence," *United States v. Miller*, 688 F.2d 652, 663 (9th Cir.1982); *see also United States v. Nelson*, 419 F.2d 1237, 1240, 1243–44 nn. 16–19 (9th Cir.1969), in order to support an inference of guilt. However, the evidence must include sufficient probative facts from which a rational factfinder, applying the reasonable doubt standard, could choose the hypothesis that supports a finding of guilt rather than hypotheses that are consistent with innocence. Thus, although the mere plausibility of "hypothetical[ ] ... explanations of the appellants' behavior ... consistent with innocence" does not justify disturbing a jury verdict to the contrary, *United States v. Mares*, 940

---

12. The government's concession makes it is unnecessary for us to reach Bishop's claim that 18 U.S.C. § 111 does not apply to assaults on temporary federal officers who are deputized solely to participate in a particular task.

F.2d 455, 460 (9th Cir.1991), in this instance we think that Bishop's behavior as to the assault on Agent Jordan is "perfectly consistent with that of an innocent person." *United States v. Penagos*, 823 F.2d 346, 349 (9th Cir.1987). When a defendant's behavior is entirely consistent with innocence, the government must "produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the defendant [in fact engaged in criminal conduct]." *Id.* at 349–50. In this case, the government simply has not done so.

Examining the evidence in the light most favorable to the government, and cognizant of our role as a reviewing court, we thus conclude that no rational jury could prefer the incriminating explanation for Bishop's actions over the equally logical but non-incriminating explanations for his conduct. Accordingly, no rational jury could have found that the evidence was sufficient to prove Bishop guilty of assault on Agent Jordan *beyond a reasonable doubt.*

## VII

We REVERSE all six of Bishop's convictions for assault on a federal officer and direct the district court to enter a judgment of ACQUITTAL on these counts. We REVERSE Bishop's convictions on the three drug trafficking counts because of the *Batson* violation and REMAND for a new trial on these counts.

JAMES R. BROWNING, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority except in its holding that the evidence was not sufficient to support the jury's verdict that Bishop was guilty of assault on Agent Jordan. The majority has erred, in my view, by restricting its analysis to a portion of the evidence before the jury and by assuming the jury's function of determining what inference to draw from the evidence as a whole.

The majority does not dispute there was sufficient evidence to convict the driver, Dwight Weisner, of assault. The jury heard testimony that Weisner accelerated the Blazer toward Agent Jordan as the agent stood in its path and forced the agent to dive between two parked cars to avoid being hit. Bishop was charged with aiding and abetting this assault.[1]

"To convict a defendant of aiding and abetting a crime, a jury must find beyond a reasonable doubt that the defendant 'willingly associated himself with a criminal venture and participated therein as something he wished to bring about.' " *United States v. Castro*, 887 F.2d 988, 995 (9th Cir.1989) (quoting *United States v. Cloud*, 872 F.2d 846, 850 (9th Cir.1989)). "[T]he government must prove only that the abettor intended to assist the perpetrator of the crime." *Castro*, 887 F.2d at 996 (citing *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir.1980).

As the majority notes, our task on appellate review is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979) (emphasis in original). It is settled law that "[t]he abettor's criminal intent may be inferred from circumstantial evidence," *Castro*, 887 F.2d at 995–96 (citing *Zemek*, 634 F.2d at 1174; *United States v. Groomer*, 596 F.2d 356, 358 (9th Cir.1979)).

From the circumstantial evidence presented in the case, a rational juror could conclude beyond a reasonable doubt, as these jurors did, that Bishop intended to and did assist Weisner in his assault upon Jordan.

The evidence showed that DEA agent Jordan, posing as a drug dealer, arranged to purchase a large quantity of cocaine from Bishop. Bishop went to the parking

---

1. 18 U.S.C. § 2(a) provides that
   Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"Aiding and abetting is implied in every federal indictment for a substantive offense." *United States v. Armstrong*, 909 F.2d 1238, 1241 (9th Cir.1990).

lot where the transaction was to occur, was led to Jordan's car, and introduced himself to Jordan. Bishop told Jordan he would sell Jordan a pound of cocaine. Jordan counted out the purchase price in front of Bishop. Bishop told Jordan he had the cocaine in his car. Bishop walked with Jordan to Bishop's Blazer, where Weisner was sitting in the driver's seat. At Bishop's direction Weisner retrieved the cocaine from the center console, and Bishop showed the cocaine to Jordan. Bishop told Jordan to return to his car, drive it to Bishop's Blazer, pay Bishop and get the cocaine. Bishop took the front passenger seat in the Blazer.

As Jordan walked away in the direction of his own car, he gave the prearranged arrest signal. Back-up officers who had accompanied Jordan to the parking lot moved to surround Weisner and Bishop in the Blazer. Their attempt to escape ensued.

Bishop was apparently in charge, and the jury reasonably could infer Weisner would be receptive to his direction. Agent Jordan testified that after Bishop pointed to Jordan, Weisner drove the Blazer directly at Jordan rather than turning away. Another agent testified that after Bishop pointed at Jordan, the Blazer accelerated toward Jordan rather than reducing speed. The jury could consider it significant that, only mo-

ments before, Bishop had negotiated a drug deal with Jordan, who represented himself to be a drug dealer. When Jordan confronted the Blazer, he revealed himself to be the undercover agent who had just set Bishop up and now sought to block his escape. The jury could also consider it significant that although Bishop and Weisner were confronted by six officers as they fled—two before the encounter with Jordan, three after—Bishop pointed only at Jordan. I believe the jury reasonably could conclude from these circumstances that Bishop pointed to Jordan to identify Jordan to Weisner as a target to attack.[2]

The majority holds the evidence insufficient because Bishop's pointing "is entirely consistent with a number of reasonable explanations *other* than" guilt. At 830 (emphasis in original). Indeed, the majority concludes that "no rational jury could prefer the incriminating explanation for Bishop's actions over the equally logical but non-incriminating explanations for his conduct." At 831. The majority suggests three non-incriminating explanations: Jordan "was telling Weisner, 'Look out, he's got a gun!', 'Look out you're going to hit him!' or 'Look out, you're going to hit that car!' " At 830.[3]

A rational jury could reasonably reject the notion that Bishop was simply warning

---

**2.** The prosecutor made this point in his closing argument stating:

> BISHOP ONLY POINTED AT ONE PERSON, AND THE ONLY PERSON THE DEFENDANT BISHOP POINTED AT IS UNDERCOVER AGENT JORDAN. AND THAT'S THE ONE PERSON IN THE PARKING LOT, AS THEY DROVE SOUTH, THAT THE DEFENDANT BISHOP KNEW FOR A FACT HAD BEEN THE CULPRIT, THE ONE TO DOUBLE-CROSS HIM AND WAS EITHER AN INFORMANT OR A COP. RIGHT.
>
> HE WAS POINTING AT DEFENDANT—AT JORDAN AS WEISNER WAS DRIVING STRAIGHT FOR HIM AND WOULD HAVE CONTINUED TO DRIVE AT HIM HAD JORDAN NOT JUMPED OUT OF THE WAY. [R.T. 4–107].

**3.** Defense counsel also offered these alternative explanations to the jury.

> WHAT EVIDENCE IS THERE ABOUT WHY LEO WAS POINTING? IMAGINE ALL THE POSSIBILITIES, LADIES AND GENTLEMEN.

> MAYBE HE'S NOT POINTING EXACTLY AT MR. JORDAN, BUT HE'S POINTING AT ALL THE CARS THEY'RE ABOUT TO HIT. OR IS HE SAYING—REMEMBER, AGENT JORDAN PULLED OUT A GUN? IS HE SAYING, "LOOK, THAT GUY HAS A GUN. LET'S GET OUT OF HERE. LOOK, THAT GUY HAS A GUN. STEER AWAY FROM HIM," OR IS HE JUST SAYING, "LOOK, THERE'S THE GUY. YOU WERE TALKING TO HIM EARLIER," WITHOUT SAYING ANYTHING ABOUT WANTING MR. WEISNER TO DRIVE AT HIM?
>
> . . . .
>
> IS THAT PROOF BEYOND A REASONABLE DOUBT, LADIES AND GENTLEMEN? I MEAN I GAVE YOU ABOUT FOUR OR FIVE DIFFERENT ALTERNATIVES ABOUT WHAT THE POINTING COULD BE ABOUT; ALL OF THEM, I SUBMIT, PERFECTLY REASONABLE. ARE YOU GOING TO CONVICT A MAN OF ATTEMPTED MURDER OR ASSAULT WITH A CAR BASED ON THAT? [R.T. 4–68–69].

Weisner that Jordan had a gun—both of the officers who had just confronted the Blazer had fired at the vehicle, as did two of the three officers who followed, and Bishop had pointed at none of them. A rational jury could also reject the suggestion that Bishop was expressing concern that Weisner might inadvertently strike Jordan—who was the source of their trouble; or expressing concern that Weisner might collide with another vehicle—when Weisner had just collided with at least three others, two of them deliberately.

Assuming one or more of the inferences suggested by the majority might be reasonable, as the majority itself notes, "the government's evidence need not exclude every reasonable hypothesis consistent with innocence." *United States v. Miller*, 688 F.2d 652, 663 (9th Cir.1982); *United States v. Nelson*, 419 F.2d 1237, 1240 (9th Cir. 1969). *See also United States v. Mares*, 940 F.2d 455, 460 (9th Cir.1991) ("[w]hile one can certainly conjure hypothetically plausible explanations of the appellants' behavior that are consistent with innocence, that is not the appropriate standard"); *United States v. Fleishman*, 684 F.2d 1329, 1340 (9th Cir.1982) ("[t]he question to ask is not whether the evidence excludes every hypothesis except guilt, but whether the trier of fact could reasonably arrive at its conclusion").

Conceding the government's evidence need not exclude every hypothesis consistent with guilt, the majority suggests the evidence in this case was "perfectly consistent" with innocence. At 831. The majority can be referring only to the isolated fact that Bishop pointed at Jordan, for obviously Bishop's behavior as a whole was not "perfectly consistent" with innocence: he arranged a substantial sale of drugs and when detected fled, throwing the drugs away, ignoring the officers' commands to halt, and seeking to escape in a manner that threatened the lives and property of others. It is axiomatic that when evaluating sufficiency of the evidence it must be considered as a whole. Considering the evidence as a whole, it was sufficient, in my opinion, to permit a rational juror to conclude beyond a reasonable doubt that

Bishop participated in the assault upon Jordan by marking Jordan as its target.

The majority has confined its analysis to the single fact that Bishop pointed at Jordan on the premise that only this evidence differed from that available against Bishop on the charges of assault against other officers, charges which the government had chosen to drop. The majority's premise is mistaken. The evidence that Bishop had a particular reason for participating in the assault against Jordan, because Jordan was the undercover agent who had set Bishop up, was evidence applicable only to the assault on Jordan. Moreover, the government's decision not to proceed against the other officers cannot justify ignoring the evidence common to those charges and the charge against Jordan, as the majority apparently holds.

It is probably of little significance even to Bishop whether his conviction on Count 6 is reversed for insufficiency of evidence. I dissent only because the approach taken by the majority may have an unsettling effect upon review of convictions based on circumstantial evidence. Jury instructions that circumstantial evidence must be such as to exclude every reasonable hypothesis other than guilt were rejected by the Supreme Court in *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954), as "confusing and incorrect." In *Nelson*, we noted that such formulations can be confusing to appellate courts as well, leading them to fragment the evidence rather than consider it as a whole, 419 F.2d at 1245, and to invade the "exclusive function of the jury to ... draw reasonable inferences from proven facts." *Id.* at 1241. Both of these consequences, in my opinion, are reflected in the majority's approach to the case.