749 So.2d 276 (1999)
Nathaniel LARD a/k/a Nathaniel Davis Lard a/k/a Nate Lard, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-01427-COA.
Court of Appeals of Mississippi.
September 7, 1999.
*277 David A. Stephenson, Meridian, Attorney for Appellant.
Office of the Attorney General by W. Glenn Watts, Attorney for Appellee.
BEFORE SOUTHWICK, P.J., BRIDGES, AND IRVING, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. Nathaniel Lard was convicted of the sale of a controlled substance. On appeal, he contends that the reasons given by the State for striking black potential jurors were not racially neutral, and that a videotape should not have been admitted into evidence. We find no reversible error and affirm.

FACTS
¶ 2. On October 26, 1990, agents from the Mississippi Bureau of Narcotics conducted undercover drug "sting" operations in Lauderdale County. Undercover agent Frazial Williams and a confidential informant drove to Scruggs Grocery, a suspected location at which drug dealers conducted their trade. The informant exited the vehicle and approached the defendant Lard. She told him that the other person with her wished to purchase crack cocaine. The informant then entered the store.
¶ 3. Lard approached the vehicle and asked what the agent wished to purchase. Agent Williams responded that he wanted $200 worth of crack. Lard agreed and entered the store. When he returned, he had in his possession eight rocks of cocaine. Williams bargained a bit, and Lard ultimately agreed to sell him nine rocks for $200. Two other agents listened to the transaction by way of the transmitter with which Williams had been equipped.
¶ 4. Williams later identified Lard through photographs that the other agents showed him. He also identified Lard during another transaction two weeks later at Scruggs Grocery, this sale being videotaped. Lard allegedly also sold drugs to Agent Williams on that occasion.
¶ 5. Lard was indicted in April 1991, for the unlawful sale of a controlled substance. However, due to Lard's apparent flight from justice, he was not arrested until 1997. Following a trial held in the Lauderdale County Circuit Court, Lard was convicted and sentenced to thirty years in the Mississippi Department of Corrections. The judge further ordered that Lard pay a $10,000 fine.

DISCUSSION

I. Batson violation
¶ 6. At trial, the State exercised five of its peremptory challenges to exclude black members of the jury panel. Lard objected and the court held that he had established a prima facie case of racial discrimination. The State was then directed to give racially neutral reasons for striking each potential juror. The court accepted each of the reasons as race neutral and allowed the State to strike the jurors. On appeal, Lard argues that the reasons given by the State were not race neutral but were based on stereotypical assumptions.
¶ 7. The need to examine the use of peremptory challenges for possible discriminatory purposes was established in Batson v. Kentucky, 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Once *278 either party has established a prima facie case of discrimination by the use of the challenges, the other party must supply reasons that are racially neutral. The same degree of justification for a peremptory challenge is not needed as is required for a challenge for cause. The party objecting to a challenge may try to rebut the reasons that have been offered. When no rebuttal is given, the court simply examines the stated reasons for the challenge. Harper v. State, 635 So.2d 864, 867 (Miss. 1994).
¶ 8. Lard objected to the State's exercise of its first four peremptory challenges, all of which were used against blacks. The State also had accepted five black and seven white jurors. The trial judge stated "I think caution would be that the State provide a racially neutral reason."
¶ 9. The first juror struck had indicated that he would have difficulty convicting the defendant based upon the testimony of only one witness. The next acknowledged that he had a family member who had been charged, but not yet convicted, of a crime. No serious objection is made here to those strikes. These strikes comply with supreme court precedents. Lockett v. State, 517 So.2d 1346, 1357 (Miss.1987) (involving juror with grave reservation with respect to her ability to adequately look at and appraise the tape recording evidence); Magee v. State, 720 So.2d 186, 190 (Miss.1998) (involving family member who had been convicted or charged).
¶ 10. The reasons given for striking the remaining three jurors are said to stereotype minorities. Juror number fourteen was stricken because she was twenty-five years of age, unmarried, had five children, was unemployed, and had no way to support the children. The State argued, she "doesn't really have a stake in our community." The prosecutor said "[s]ame thing" for Juror number sixteen, who was twenty-five years old, unemployed, and an unmarried mother of two children. The defense counsel argued that being unmarried did not foreclose that they might be getting child support and other financial contributions from the fathers, and did not mean that they were on welfare. The prosecutor's response was that there were no white jurors who had the same answers on their questionnaires, but had there been he would have struck them too. The judge found these challenges to be racially neutral.
¶ 11. After the defense then used its first four peremptory challenges on white jurors, the roles of explaining the reasons and opposing them were reversed. The court accepted all defense strikes. The final peremptory challenge then used by the State was to exclude Juror number 24. He was thirty-seven years old, unmarried, unemployed, and the father of two children. The court also accepted this as a racially neutral reason.
¶ 12. The supreme court dealt recently with a quite similar appeal:
As to the next two jurors, juror 2 was thirty-five years old, had three children and no husband. Juror 6 was twenty-eight, had two children and was unemployed. All of these reasons have been held to be racially neutral. Lockett v. State, 517 So.2d 1346, 1356-57 (Miss. 1987). In Lockett v. State, 517 So.2d 1346 (Miss.1987), this Court presented a list of reasons accepted as race neutral by other courts throughout the country in an effort to provide guidance to trial judges in this state, including age, demeanor, marital status, single with children, ... employment history,... unemployed with no roots in the community.... Lockett, 517 So.2d at 1356-57; Davis v. State, 660 So.2d 1228, 1242 (Miss.1995).
Gibson v. State, 731 So.2d 1087 (¶ 25) (1998). The court held that "[i]n light of Lockett, the explanations given by the State on jurors 2 and 6 are race-neutral." Id.
¶ 13. If the reason stated is facially race-neutral, deciding whether it is a pre-text *279 and lying unstated is instead a racially discriminatory motive is left to the sole discretion of the trial judge. Harper v. State, 635 So.2d 864, 868 (Miss.1994). We find that the trial judge did not err in allowing the prosecution to use these peremptory challenges.

II. Videotape
¶ 14. Lard contends that the admission into evidence of a videotape depicting an apparent drug transaction was prejudicial. The tape was made on November 9, 1990, approximately two weeks after the sale in the present case, when Agent Williams made a second purchase from Lard. Without stating that it showed a drug sale, Williams testified that he used the video along with photographs to identify Lard. The video depicts Lard approaching a vehicle driven by Agent Williams, whose face is not shown. Lard got inside the vehicle and later exits. He then stands beside a truck. The events on the video occurred at Scruggs Grocery, the same location as the transaction in the present case.
¶ 15. Lard's attorney objected to the introduction of the videotape into evidence, arguing that although it does not actually show drugs changing hands, the jury would likely infer that such a transaction did occur. He contends that the prosecution was attempting to intimate to the jury that a second drug sale occurred. Lard argues that the prejudicial value under M.R.E. 403 outweighs the probative value of establishing identity. He claims that the jury would view the events on the video and assume that he had sold drugs a second time.
¶ 16. The trial court overruled Lard's objection and admitted the video into evidence as proper evidence of identity. M.R.E. 404(b). He noted that the tape had no audio. Further,
The videotape, from my observation of it, does not show a hand-to-hand transfer of anything between anybody that I can detect. It shows an individual talking to theapparently talking to the driver of a vehicle and then someone later coming around and getting into the passenger side front seat of that vehicle for a few seconds and then exiting the vehicle. The probative value as it relates to the identification or misidentification of the defendant is great in my judgment, it now being seven years after the fact. The prejudicial effect, that is, the inference that what the jury may be viewing is another alleged drug transaction is to my way of thinking not that great.
The court instructed the State not to question Agent Williams regarding any drug transaction which may have occurred on November 9. He further stated he would grant a cautionary instruction.
¶ 17. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. M.R.E. 404(b).
¶ 18. Lard's defense at trial was misidentification. During voir dire, Lard's attorney questioned the potential jurors as to whether they believed a law enforcement officer was capable of making a mistake. Defense counsel further alluded to misidentification in its opening argument, informing the jury that "[t]he identification procedure used is going to be `iffy' at best." The defense was sufficiently raised so that the State was entitled to respond by using the video tape to strengthen the identification given by Agent Williams. The video tape was probative as to the identification of Lard, particularly because his trial occurred nearly seven years after the drug transaction.
¶ 19. If prior bad acts evidence falls within a 404(b) exception, its prejudicial effect must still be weighed against its probative value to determine admissibility under M.R.E. 403; Underwood v. State, *280 708 So.2d 18, 32 (Miss.1998). Though the tape did not explicitly reveal a drug transaction, a necessary consideration for the trial court was whether the jury would assume as much. That consideration was perhaps the basis for the court to write this limiting instruction:
The video tape was admitted in evidence in this case. You may not consider any inference in the video tape that the defendant may have sold cocaine on November 9, 1990 and therefore, he must have sold cocaine on October 26, 1990. The video tape was admitted as evidence solely on the issue of identification or misidentification of Nate Lard by the undercover officer Frazial Williams on October 26, 1990.
Defense counsel stated that he preferred the limiting instruction that he offered, but if this "is the only cautionary instruction I can get, then we will take that." Lard's alternative was this: "The court instructs the jury that the video tape in this case is not to be considered by you as evidence of guilt on the charge of sale of cocaine against Nate Lard."
¶ 20. The problem in the trial court's view with Lard's proposed instruction was that it was incorrect since the videotape was to be used to prove guilt by proving identity.
¶ 21. Therefore, the issue is whether the probative value of this videotape in proving identity, a key issue, was so outweighed by unfair prejudice to the accused as to have caused reversible error. The judge had played for the jury what he thought was the necessary minimum of the tape. He also, with the defense counsel's reluctant acceptance, gave what he believed to be the required information in a limiting instruction. These are considerations in reducing the unfair prejudice that can arise from some probative evidence. Not suggested below was some alternative to admitting the tape. Were there ways for the witness to explain the two week later meeting with Lard without showing the tape? It is debatable whether meaningfully less prejudicial alternatives existed. A jury might infer that any later meeting, no matter how generically described, between someone being prosecuted for a drug sale and the undercover agent who had made the purchase, was likely for another drug transaction. Regardless, we cannot find the trial court in error for not choosing a road that no one else seemed to be considering either.
¶ 22. We hold that Lard's making identity a critical part of his defense permitted the trial court, in the cautious manner that it did, to admit this tape.
¶ 23. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF SALE OF A CONTROLLED SUBSTANCE AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND $10,000 FINE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO LAUDERDALE COUNTY.
McMILLIN, C.J., BRIDGES, DIAZ, LEE, MOORE, AND THOMAS, JJ., CONCUR.
IRVING, J., CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY KING, P.J., PAYNE AND THOMAS, JJ.
IRVING, J., concurring:
¶ 24. The majority holds that if the reason stated for striking a juror is facially race-neutral, deciding whether it is a pretext and lying hidden and unstated is instead a racially discriminatory motive is left to the sole discretion of the trial judge and cites Harper v. State, 635 So.2d 864 (Miss.1994). While this is a true statement of the law, that does not mean that a facially race-neutral justification given by the State will always satisfy the Batson proscription. U.S. v. Bishop, 959 F.2d 820, 826 (9th Cir.1992) (citing Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, *281 114 L.Ed.2d 395 (1991)) instructs that if the justification is tainted by impermissible generalizations regarding racial groups and their environment, the trial judge's credibility determinations are not in question. The trial judge need not reach the issue of whether the prosecutor's explanation was honest or merely a sham, for even assuming it was sincere, the State's explanation is not sufficient to satisfy Batson because a discriminatory intent is inherent in the prosecutor's explanation. Id. at 827.
¶ 25. The Batson facts in our case today are somewhat similar, though not analogous, to the Batson facts in Bishop. The factual situation in Bishop was as follows:
Jury selection began on July 25, 1989. Out of a possible seven peremptory challenges, the government exercised five. Three were used to strike white jurors; the remaining two were directed at black jurors. Citing Batson, defense counsel objected to the last challenge aimed at Ms. Burr, a black eligibility worker living in Compton. He moved for a mistrial or, in the alternative, the reseating of the challenged juror.
The prosecutor then volunteered an explanation for his decision. He stated that he felt that an eligibility worker in Compton is likely to take the side of those who are having a tough time, aren't upper middle class, and probably believes that police in Compton in South Central L.A. pick on black people. To some extent the rules of the game down there are probably different than they are in upper middle class communities. And they probably see police activity, which is, on the whole, more intrusive than you see in communities that are not so poor and violent. In response to a question from the bench, he added that "her primary sympathy ... is likely to lay with people whom she comes into contact with every day."
In addition, the prosecutor pointed to the fact that Ms. Burr's husband was himself an eligibility worker and, later in the hearing, suggested that her age was also a factor in his decision, because it was approximately that of the defendant's mother. Finally, in support of his contention that he had not stricken Ms. Burr on the basis of race, he stressed that two blacks remained on the jury and asserted both that he would not have challenged a black eligibility worker from an affluent community and that he would have challenged a white eligibility worker from Compton.
Defense counsel reiterated his concern, contending that the reasons provided by the government were not race-neutral. Specifically, in view of the fact that approximately three quarters of Compton' s population was black, he argued that residence in this case served as a mere surrogate for race.
Bishop, 959 F.2d at 822 (alteration in original) (record citation omitted).
¶ 26. In deciding the Batson issue, the Bishop court stated, "Bishop's claim focuses on the use of a criterion closely tied to race and raises the following question: Under what circumstances does such a criterion cease being race-neutral and become a surrogate for impermissible racial biases?" Id. at 823.
¶ 27. The court noted the Government's argument that the prosecutor did not challenge Ms. Burr because she was black, but (at least in part) because she lived in Compton, a poor and violent community whose residents are likely to be "anesthetized to such violence" and "more likely to think that the police probably used excessive force." Id. at 825. In finding the prosecutor's explanation pretextual, the Bishop court found that "the proffered reasons (that people from Compton are likely to be hostile to the police because they have witnessed police activity and are inured to violence) are generic reasons, group-based presuppositions applicable in all criminal trials to residents of poor, predominantly black neighborhoods. They amounted to little more than the assumption that one who lives in an area heavily *282 populated by poor black people could not fairly try a black defendant." Id. at 825.
¶ 28. "To strike black jurors who reside in such communities on the assumption they will sympathize with a black defendant rather than the police is akin to striking jurors who speak Spanish merely because the case involves Spanish-speaking witnesses ... the prosecutor's justification in this case, unlike in Hernandez, referred to collective experiences and feelings that he just as easily could have ascribed to vast portions of the African-American community. Implicitly equating low-income, black neighborhoods with violence, and the experience of violence with its acceptance; it referred to assumptions that African-Americans face, and from which they suffer, on a daily basis. Ultimately, the invocation of residence both reflected and conveyed deeply ingrained and pernicious stereotypes. Government acts based on such prejudice and stereotypical thinking are precisely the type of acts prohibited by the equal protection clause of the Constitution." Id. at 825 (citations omitted).
¶ 29. In the case sub judice, the justifying reasons offered by the prosecutor were as follows:
Angero: Juror number 14 is 25 years of age. she is unmarried. She has five children and is unemployed. And as I have said many times before, Judge, somebody thatshe obviouslyshe doesn't have any way to support five children. I mean, I think it shows a person who doesn't really have a stake in our community. I mean, they're she is not providing. She is young. I think it indicates somebody who is-doesn't have awell, let's put it this way. Doesn't have her feet on the ground, responsible citizen of this county. Same thing for juror number 15, although she has two children. She is 25, unemployed and has two children. Both of them are unmarried. So they don't have a husband who's providing support.
Court: How many children?
Angero: Two.
Court: Any other
Angero: No, sir.
Court:reason? Rebuttal by the defense?
Stephenson: Yes, sir. There is no indication that nobody is providing support for them. They check they're not married on the thing, but it doesn't mean they're not married and divorced. I mean, there is no evidence of any-that they are not supportingyou don't have any idea whether somebody is paying them ten thousand dollars a month child support. You don't know whether they're possibly living with their ex-husband, whether their husband was killed and they have a bunch of life insurance. You know, this is just an assumption because they're black and unmarried and have children that they're on welfare, and, you know, doing this. I mean there's absolutely no evidence of that and it's not indicated on the questionnaires either.
Angero: Judge, I point out to the Court that first of all, I would have stricken any white juror that had that same thing. But there are no white jurors that have that samethat same scenario in their questionnaire. Look through it if you like, but that's the way it is.
¶ 30. I believe the prosecutor came dangerously close to offering a justification tainted by impermissible generalizations regarding racial groups and their environment within the holding of Bishop. According to a pamphlet published by the Mississippi Employment Security Commission in March 1999, titled Labor Market Information for Affirmative Action Programs, (in which the race and gender breakdowns were obtained by applying 1990 Census ratios to estimates of total population for 1998), the unemployment rate among nonwhite females is the highest *283 of all groups and at 11.1%, more than three times that of white females which was 3.6%. This statistic makes the prosecutor's reasons look suspiciously similar to a stereotypical racial reason.
¶ 31. However, I concur in the result reached by the majority for two reasons. First, our supreme court, in Davis v. State, 660 So.2d 1228 (Miss.1995) which is cited by the majority, approved as race-neutral the reasons offered in this case. Second, there is nothing in the record to make the nexus between the unemployed, single status of the jurors and their race. While I am aware of the general perception fostered by the media that there are more single, unemployed African-American females than whites, I cannot take judicial notice of same nor is the perception fact-based. While there is a greater percentage of African-Americans who are unemployed, in proportion to their overall population, whites actually constitute the greater number of unemployed persons in our state. Therefore, I concur with the majority in finding no Batson violation. But even though I find no Batson violation, I think strikes based on a juror's employment and marital status may well in certain instances be nothing more than a surrogate for race as residence was found to be in Bishop. I believe it is against public policy, a denial of the equal protection clause of the U.S. Constitution and a contravention of the mandate of Batson for any person to be stricken from jury service because of employment or marital status if it can be shown that that person's status factor is closely related to race. While I do not think such a showing was made here, I would caution prosecutors and defense attorneys to be loath to utilize peremptory strikes on jurors who may possess a group status closely related to race unless it can be shown during voir dire that factors, other than those related to the group status, exist which would make a particular juror undesirable because of the other factors.
KING, P.J., PAYNE AND THOMAS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.